17-3500 17-3537 17-3538 USA v. Kurt L. Mallory, Susan M. Piosh, Margaret L. McKnight Oral argument as follows, 10 minutes for each defendant, 30 minutes for the plaintiff. Ms. Addenaro, Mr. Pox, and Mr. Binza for the defendant's appellants. Good morning. Good morning. May it please the Court, my name is Catherine Addenaro from the Office of the Federal Public Defender on behalf of Kurt Mallory. I'd like to reserve two minutes for rebuttal. Fine. Thank you. Kurt Mallory raises three issues for the Court today. First, whether a Sixth Amendment right was violated when the District Court excused the government's key witness from testifying live at trial. Second, whether the Court erred in admitting an unauthenticated document and related testimony at trial. And third, whether the Court applied the incorrect legal standard when denying his motion for a new trial. The answer to all three questions is yes. Testimonial out-of-court statements are only admissible if the declarant is unavailable. The record does not support a finding that Gary Mallory was unavailable at the time of trial. The government cited the medical records, the most recent of which being from 2016, June of 2016. The trial took place in November of 2016. So I think the timeline here is very important. So I'd like to walk the Court through the timeline from when the Court appointed counsel for Kurt Mallory on March 2, 2015, all the way to trial. So counsel was appointed on March 2, 2015. On March 4, 2015, Kurt Mallory was arraigned. The government did produce initial disclosures at that point to counsel. On March 9, 2015, a status conference was held, at which point the Court declared the case complex and the government made an oral motion to depose Gary Mallory based on his health. He had been diagnosed with cancer and was in assisted living at the time. The Court granted that deposition and set it for May 5, 2015. And during that time, was Gary in Arizona? Yes, he was. So the deposition was set to take place in the Arizona Federal Courthouse, obviously in Arizona. So on April 30, 2015, Kurt Mallory's attorney files an objection, a written objection to the deposition, arguing first that there's no real proof that he's unavailable, that the medical records don't support that finding at that time. And second, if the Court were not inclined to grant that objection for a continuance, because at that point counsel said the discovery was voluminous, had not had a chance to prepare properly for trial. We were still getting discovery at that point. At that point, we had not. We'd had a photocopy of the will, which had been in the lab for testing. We didn't have the copy. We'd not actually seen the copy itself, nor had we seen any of the results from all the testing. What was the voluminous? What were the documents? What was it? It had everything related to bank records, medical records. It covered about four years of the investigation. The indictment covered about a four-year period. So getting to boil down to what the issue was that Gary was going to testify and why he might have been testifying the way he was going to be testifying took a little bit of time to find out whether there was something that would counter his testimony. So a lot of it turned out to be related to other issues, the bank records, things of that sort. There were things that needed to be sorted out about Sue Peock reporting to the police of the prior incident involving Gary Mallory and his extortion threat, things of that sort that were in there. We just needed to find them. So there were approximately 14,000 bait-stamped pages in that discovery at the time that they were initially disclosed. But the deposition occurred in what date? May 6 of 2015. Of 2015, and then the trial is in November. November of 2016. And you or your predecessor were present during the actual deposition. It was a video deposition in Arizona. That's correct, Your Honor. Yes. So when attending the deposition, it was the judge, obviously Gary Mallory, Kurt Mallory and his counsel, Sue Peock's counsel, I don't know if she was there, and Margaret McKnight's counsel was there. So your position, did you make the argument to the district court that Gary's situation was improved or was different from what it was during the time that you were not the counsel below, right? I was second chair. So you were there. So did your side make the arguments that something had changed or that there was some reason why Gary should be forced to come to Toledo for the trial? We never argued that Gary should come to Toledo for trial. We only ever argued that Gary should appear at the federal courthouse in Arizona and testify by live video feed. So there was never a question or never an argument made from us that he needed to travel out of. But to Judge Moore's point, did you ever make an argument that he was more capable closer to trial? In other words, that he was capable of doing that and his condition had improved from what the judge knew his condition to be. And I thought, in fact, you were making at one point the argument to the contrary, that he had dementia and that that should be at least a part of the cross-examination, et cetera. That's correct. There was never an argument to answer the question. There was never an argument made that his condition has improved. The argument was that his condition was at best the same from the time that he traveled to the courthouse to sit for the deposition and to the point where we were ready for trial. So his condition was pretty much the same, and he appeared for the deposition. There was no reason why he couldn't appear there for trial as well. We did make – I'm sorry. But there's the dementia issue that Judge Sipar is alluding to. That is correct. How did that play into this? So we made the objection in April before the deposition. The deposition came in May. Then in July we received medical records that he had been diagnosed with chronic dementia. We didn't know what that meant, whether that sort of impeded or might change his testimony in some way. We wanted to have an evaluation. Remind me, did the judge offer that you could take a second deposition? There was never a discussion about a second deposition. Did you ask for a second deposition? We did not. But he did allow you to impeach the witness at trial with expert testimony or the like, correct? Expert testimony as far as his medical? Dementia. He didn't disallow. We didn't offer that because our medical expert wouldn't opine to his mental condition at trial because he wasn't able to evaluate him. So some of the problem was after we received – But didn't the judge say that he could look at the deposition, he could look at the medical records, that your expert could look at a lot of other things to opine on the witness, right? That's correct, and our medical expert did, and it did produce a letter that I think was attached to the opposition. I can't remember. It might be 174, docket 174. But the medical expert could only go so far. So after we received the medical records from July indicating a diagnosis of dementia, we worked with his trial counsel. He even said you could – and I'm sorry to interrupt you – but he even said you could introduce the medical records themselves. We did not introduce the medical records. But he did say you could, correct? I assume – I honestly don't remember, but that's possible. Okay. I don't remember him saying we couldn't. I see that your red light is on, and I did want to ask you one question about the new trial issue. Yes, sir. Suppose that we were to believe that the district judge applied the wrong standard and applied the Rule 29 standard instead of the Rule 33 standard. Could we apply the Rule 33 standard ourselves without remanding it to the district court? No, Judge, because the limited scope of review for this court in Rule 33, the manifest weight, is this court cannot reweigh the evidence. So you're effectively denying the district court the opportunity to do it in the first instance. All this court can do is to look to see whether the judge abused his discretion, which we argue he did because he applied the wrong legal standard. So I'm not clear on whether this district judge is still sitting as a district judge. Do you know the answer to that? Yes, he is. Thank you. Thank you. Your red light is on. We'll give you your rebuttal time. Thank you, Judge. Good morning. Michael Benza on behalf of Margaret McKnight. May it please the court, I would like to reserve two minutes for my rebuttal. Right. I'd like to focus my discussion this morning on the second issue presented in the case, and that is the issue of the handwriting testimony and analysis. Larry Olson is an ink chemist and document examiner for the IRS, and he testified in the critical component of this case, and that is whether or not Mr. Foulis' will was in fact a forgery or a legitimate will. His testimony is nothing but junk science. Handwriting analysis, when it comes to determining whether or not something is a forgery, is not an accepted scientific principle. It's not subjected to scientific review. It's not subjected to peer review, and it fails on all aspects of the Daubert testimony, and the district court erred in finding that it did. How do you deal with our Jones case and all the other circuits that have said it's admissible opinion evidence? So first off, Jones was decided pre-Daubert and was not subjected to the Daubert analysis. Most of the circuits that are reviewing the issue of handwriting analysis are reviewing it under evidence rule 702 or 901. That's a predicate question first must be addressed as to whether or not it's reliable scientific evidence under Daubert, and that is something the circuits have not yet started to address. The district courts, however, are addressing it across the country and almost uniformly, finding that when it comes to determining forgery, handwriting analysis is not a scientific principle. But it's different to say it's not scientific and it's not something that can be expert opinion. That's correct. We're not debating and arguing that Larry Olson is not an expert and satisfies the testimony under 702. The issue is whether or not what he's an expert in is in fact real science. This is analogous to the FBI's extensive witness testimony. I'm sorry, I lost you there. Are you saying he can give a specialized opinion or no? He cannot because the evidence, the expertise that he has is not an accepted scientific principle. But we're not debating whether or not he's qualified to do his job. But aren't you saying then that only experts who testify about science can testify? No. No, Your Honor, no. The only experts who testify whose idea or issue that they're testifying about satisfies the Daubert standards. Could a lay witness give this opinion? A lay witness could. A lay witness could say this looks like it or looks not like it. The issue becomes when the expert then makes the second step and says this document is a forgery, which is what Larry Olson testified. It's not whether or not this looks like Mr. Foulas' signature or doesn't look like it. That's how he concluded it, right? So he's not saying in my expert opinion this is a forgery. He's saying based upon my conclusion of the signature, this is a forgery. Correct. Based on his analysis of the sample signatures and the will. That's a conclusion if a lay witness said this isn't the signature. That's just the natural conclusion that it was forged. Correct. It's that secondary step, however, that runs afoul of Daubert. Explain that to me because I don't understand how that's expert analysis versus just a conclusion drawn from the analysis of the signature. There is a difference between a conclusion that simply says this signature does not look like this signature and a decision that says this signature is a forgery of an original signature. The reason you're saying that is the same person could have two different signatures. I'm sorry, go ahead. In fact, that's what Larry Olson testified about. He said there are two guiding principles when it comes to forgery handwriting analysis. First, individual handwriting is unique. Second, there are disparities among individuals' handwriting. So in that type of a situation, he looks at that and says, well, there are similarities because this must be the same person. But then he can explain away any differences between a sample and a composite by saying, oh, well, there are going to be inherent differences even if it's written by the same person. So we end up with a situation where he is able to choose what it is he's giving value to in order to reach his conclusion. Taking out the fact that he doesn't actually even then control for variables that could, in fact, impact a person's signature from one point in time to another. So what would you say are your best cases to support the principle that you're arguing for here? We've cited extensively the district court cases in the court. I don't have, Your Honor, the citation to the case right off the top of my head. Do you have any circuit cases? Not at this moment, no. They're working their way through, but it's the district court that decides these cases on first instances. Now, I believe that one of the defendants introduced a handwriting expert as a witness in this case. Yes. Was it your client? Yes. Okay. So would this disqualify your expert as well? Of course. Yes, it would. And did you argue that your witness was able to opine? No, I did not. I did not represent Mr. McKnight at trial. No, we did not argue in our brief to this court that the dueling witnesses somehow canceled each other. I don't know. Did your client, so that's a better way of asking it, argue below that your witness was qualified? Yes. Yes. Although, excuse me, by that point the district court had already had the Daubert hearing on handwriting. I'm sorry, Your Honor. Isn't there sort of a waiver idea that if your client argued below for a handwriting expert and now you're challenging on appeal the government's handwriting expert on the grounds that it's not appropriate for expert testimony as a whole field, there seems to be at least a waiver kind of argument. There may be some other term to describe it, but let's call it an unseemliness. I don't think that there is an inconsistency in that. The initial argument was made to the district court that there should not be forgery evaluation and evidence presented. And the district court permitted that. It then becomes incumbent on the counsel to find their own expert to come in and rebut the expert that the government is going to present. It's no different than when the FBI would They didn't retain your expert until after the Daubert hearing where the government's expert was permitted. I don't know when trial counsel obtained the expert. But we saw the same situation when the FBI would testify about the composite bullet lead analysis. Did he argue below your client? Did your client argue below? I'm sorry, it's a she, right? Yes. Did your client argue below that all handwriting experts were disqualified or basically couldn't opine? No. It was limited to the issue of testifying as to whether or not a signature is a forgery. And that's what the National Science Institute has taken on directly as the problem with handwriting analysis. It's not the comparison of handwriting. It's the decision and determination that something is in fact a forgery. But didn't your expert opine it wasn't a forgery? Yes. But I'm trying to figure out what the problem is with saying that a signature is a forgery. Is that because it is the ultimate legal question? It's beyond the science. It's beyond the scientific ability to do that. And once it's beyond the ability of science to do it, Daubert says that testimony You're analyzing the signatures and you're saying, I can't say I've looked at 100 signatures from this person. This one is not one of them. You cannot say that? Correct. You cannot say it is a forgery. But you can say what Judge Dombandian said. Yes. But that's not what Larry Olson testified to. Is this harmless error? No. This is the critical component. If the jury doesn't find that this is a forged will, this case is over. But if the expert could say, I've looked at all of the signatures, 100 signatures, and I know this is not his. No, that's not what he can say. What he can say is it's not similar. It's not similar to his. Then why isn't it harmless error to let the jury conclude that it's a forgery? That would be something the jury is able to, but we know that once we wrap somebody in the robe of science, that that weight in the jury room is much greater than any other room. Do we need to get rid of Gary Mallory's testimony in order for it to be not harmless? No. The jury may not have believed Gary Mallory at all. We have no idea what they did with Gary Mallory's testimony. But he also testified it was a forgery, correct? But what they had was the IRS chemist coming in and saying, in my expert opinion, this is a forgery. Thank you. Thank you. Thank you. May it please the Court, I'm John Potts. I'm here on behalf of Defendant Appellant Suess, S-N-P-E-L-L-K. I'd like to reserve three minutes, please. Fine. Please. Judge Moore, you wrote the opinion in Jones, I believe, and that case was decided post-Daubert, pre-Kuhlmutter. And as I understand the whole thing, I believe the Court held that handwriting analysis is not a science  But in Kuhlmutter, the U.S. Supreme Court says, technical non-scientific experts are also subject to the gatekeeping requirements of Daubert. The Court below, contrary to Jones, held that the handwriting analysis is a science. Well, the United States Court of Appeals for the Sixth Circuit, in its wisdom, has held that it's not. And he went on to hold that Can we look at the entirety of the voir dire record and just conclude that the person is qualified? I mean, do we need to look at his ultimate conclusion, if we can look at the record and see that he's qualified to opine? The answer is no. The expert in Kuhlmutter was eminently well qualified, but his methodology was found not to be reliable. Judge Carr found that Olson was well qualified. Yeah, he's about as well qualified as you can get. Then Judge Carr said, and his testimony is reliable. That's a conclusion. There were no findings made as to why his methodology was reliable, which is what Daubert and Kumho-Tyre required. He testified that, I don't know, 91 signatures he had looked at and that what he concluded had been peer-reviewed and all those things. Couldn't we say, okay, he found it's reliable. Here are the reasons on the record. There's no reason to remand it for a limited finding. Well, he also said he never made an error. He's perfectly reliable, which is hard to believe.  He's just making his conclusions based on the record outside. None of this was in the earshot of the jury, correct? Not the Daubert hearing, but Olson's testimony was the only corroboration from Mallory. Olson was very impressive when I read the Daubert hearing. I said, wow, man, this guy's good. Until I dug into it more deeply and found that the methodology is inherently subjective. There is no known rate of error, no way to control for error. That argument's different than the argument you're making. And let me tell you how I phrase it. You should tell me where I'm wrong. I look at this as two arguments. The one your friend was making, which is no matter what he did, he can't opine. And the second one being the judge, he could opine, but the judge didn't make sufficient findings. Am I breaking that down correctly? Those are two distinct issues subdued in my side. But it seems to me you're kind of making the first argument, which is no, Judge, there's no situation under which this judge could have concluded his testimony was sufficiently reliable, such that it should have gotten to an expert. Is that fair? That's fair. Okay. And I don't think it can be characterized as harmless error, because this guy was so, as a jury, would have to have been swayed by him. Mallory is significantly less impressive. I would have liked to have him testified at trial, because I doubt if he could have told the same story the same way twice. But the counsel representing my client at trial waived that. I can't raise it before this court. I don't think. Why do you think your counsel waived it? Because she didn't or he didn't object? No, he affirmatively waived any objection for reasons that are unclear to me. The handwriting expert could be allowed to testify as to his or her observations. Well, I see this eye wasn't dotted the same way. There's not as much pressure here. No problem with that. And a lay expert or a lay witness on handwriting can only opine as to handwriting they're familiar with. Yeah, I've seen Judge Moore sign letters. I've typed letters that she's signed. And this looks like the way she's signed everything I've seen. Here we have an expert who's opining on handwriting he's not familiar with. But he looked at 91 signatures, right? Yes, which are all different. And you're saying that a lay witness could not look at the same 91 signatures if they didn't know the person? If they had had no prior observation of the signature. Do you have any cases for that proposition? That's the way some of the district court cases have addressed the evidence rule 901 argument. Well, gee, if you exclude expert testimonies to handwriting, it eviscerates 901 authentication. The courts say no, because that applies to a witness who's familiar with the handwriting that he's comparing it to. That's firsthand prior familiarity. Now, on Exhibit 505, Judge Carr concluded that there's no reason not to believe this exhibit is what the government says. I'm out of time. Thank you. Good morning, Your Honors. May it please the court. My name is Laura Ford. I'm here on behalf of the United States. I would like to begin very briefly with addressing an issue that the appellants have not talked about this morning. Just before I forget, as the court is aware, the government has filed a joint motion for a sentencing remand with respect to Kurt Mallory and Susan Piak. With respect to the financial hardship victim enhancement. And I just wanted to explain why we have not done that with respect to Ms. McKnight. We do not believe that she is similarly situated to the guideline-based sentences that Piak and Mallory received. In her case, the court granted a substantial downward variance to 24 months on the non-aggravated identity theft case. And in doing so, the court said it was doing so solely based on the arguments that defense counsel had made, which were tied to mitigating arguments under 3553A. In short, the court made clear that it would have imposed the same 24-month non-guideline sentence, irrespective of what that guideline range would have been. And in her case, it would have been 46 months to 57 months without that enhancement. But it should not have been applied under the ex post facto clause, because the enhancement did not become effective until after the offense conduct ended. We do believe that the error was harmless beyond a reasonable doubt, and the court can nevertheless affirm her sentence. And in support, I cite the court to United States v. Camper, which is 748 Fed 3rd, 728, specifically page 744. It's a 6th Circuit 2014 decision concerning the harmless error standard. What was the end of that cite, 748 F 3rd? Fed 3rd, 728, and looking at page 744, it's a 6th Circuit 2014 decision. Because we believe the error is harmless in her case, we'd ask that the court affirm the court's decision as to her sentence. And unless the court has questions... Why is it even before us? Well, in case the court was inclined to address it, the government would just like to explain why. We have authority to address it if it's not appealed? I have seen it done before. So just by way of explanation as to why we have not filed a joint motion in her case. And at this point, unless the court has questions, I'll move on to the other issues. With respect to the motion from the new trial, the court did apply the correct standard. The court specifically found... The court kind of bungled the standards? I mean, if you look at it, it's talking about viewing the evidence in the light most favorable to the government. Well, Your Honor, I think what is important to look at is, first of all, the court did cite the correct standard that the convictions were not contrary to the manifest weight of the evidence, which is at page ID 6054. The court did make that comment, but I think it's important to look at what the court actually did. But look at the conclusion. He says, viewed most favorably in support of the guilty verdict. Is that consistent with the Rule 33 standard? It's not, Your Honor, but what the court actually did, when you look at its analysis, is consistent with the motion for new trial. As Mallory acknowledges in his brief, when you're deciding a motion for a judgment of acquittal, by contrast, you cannot independently weigh the evidence, you cannot assess the witness credibility. And that's what the court did in this case in denying the motion for new trial. He looked at Mallory's testimony, looked at the handwriting expert's testimony, and said, you know what, they're equally plausible, it could have gone either way, they kind of cancel each other out. But then it went on and said, but Susan Peock is different, because if the jury didn't believe her, there was really no need to look at anything else. Why is that? Isn't that negative evidence? I mean, what's the affirmative evidence that comes, if you just had Susan Peock testify, what's the affirmative evidence that would have convicted the defendants? Disbelieving her is different than affirmative evidence. Well, her implausible testimony about explaining how she came into the funds, the $200,000, that she was doing work for Gary... Let's say she lied about all that, which obviously the jury thought. What's the affirmative evidence that the defendants are guilty? In other words, I'm not understanding how, just look at the elements and her testimony. Could you win? I haven't gone back and done this, but could you win just looking at those two things? I think you can. You have her testimony that just simply isn't plausible for how she got this money, why she was amending her tax returns, the fact that she advises Margaret McKnight to not engage in transactions that are over $10,000. And I think it goes to the concealment, that they knew that they were not entitled to this money, and they're trying to conceal the fact that there is this forged will. You have unexecuted documents that are dated in August 2010. One is a will that's almost identical to the June 2010 will, which was executed, and there's just no plausible explanation as to why this would be there if he'd already signed a will in June. We also had the ink analysis, where there was different ink used for the initials. You had fingerprints of the defendants, various defendants on these unexecuted documents from August 2010 that were found in Mr. Fulis' residence. So there definitely was enough there. And so by finding that Susan Peock was not credible, that's fully consistent with the jury's verdicts in this case, and the court found that it was unlikely that the jury would have credited her. And while the court did mention sufficiency, essentially it was responding to the defendants' arguments about that. Specifically, pages 5663, 5665-67 of Mallory's motion, and 6001 of Peock's reply, where the defendants are arguing that... What's the remedy if they're right? Just send it back for him to do it under the right standard? It would be a method, but I don't think that's appropriate in this case, because I think by the fact that the court found Susan Peock incredible, that there was an adverse credibility finding, I think this court can accept that view and find that it is consistent with the jury's verdict, and it can infer on that basis. So you're saying that we would be looking at statements that the district judge made to say that we could infer that his reasoning was correct? That his ruling was a proper ruling under the new trial standard? Or would we be deciding ourselves whether a new trial should have been denied? I think it would be accepting the court's view, the court's determination about Susan Peock's credibility, which I think is consistent with the Rule 33 motion, because what the court was doing was making a credibility determination, and was determining the relative evidentiary weight in this case. And that's accepting the court's view. I think that's consistent. So while the court did use some incorrect terms, I think in the end what the court did, by making that adverse credibility finding, is fully consistent with denying, with its obligations to decide a motion for a new trial. With respect to the handwriting analysis, the court properly admitted expert testimony on that, and I think that's consistent with the court's view. I think the defendant's argument seems to center on the fact that this is allegedly junk science, but it doesn't have to be scientific to admit the testimony. What's going on with the case law? Why are these district courts seeming to not be going along here? Your Honor, I don't really understand it. The issue of whether it's admissible is whether it's going to assist the jury in making a decision. I don't think it's going to assist the jury in making a determination about whether the writing is genuine, or it can be a forgery. I think it's incredibly helpful to be able simply just to point out whether there's similarities or dissimilarities. I quite frankly don't understand why it's being excluded. But your opponent is arguing that the conclusion that this is a forgery is something that cannot be admitted, because it is not a science, and it is not scientific. It's not subject, not shown to be reliable. And the district judge was pretty terse in finding reliability here, right? Did the district judge give any reason to find it was reliable? No, Your Honor, and certainly it would have been preferable to state, to provide an explanation, but the court did find that it was thoroughly reliable, and I think when you look at how active the court was during the voir dire, it makes clear the reason why the court did wholly accept it. During the voir dire testimony, the court asked specific questions about methodology, about accreditation, whether or not Olson had ever been precluded from testifying on handwriting analysis. He asked specific questions about how computer analysis works and its accuracy, and all those are tied to the Daubert factors. And I think when you look at it in that context, that it makes clear why the court accepted that view. And that's at page ID 3689, 3691-93, 3695, 3699-3700, and 3703-04, where the court was asking specific questions. It was very actively involved during that process. They seem to, at least in argument, I know they haven't technically abandoned, but abandoned the argument that he didn't make sufficient findings and focused more on what Judge Moore was saying, which is the ultimate conclusion that this is forgery is beyond the purview of expert testimony. So it didn't matter who it was and whether he himself was reliable, it's that the ultimate testimony is not acceptable, period. Why are they wrong about that? Well, because it's ultimately up to the jury to decide whether or not to accept the expert's testimony. But the jury has, I mean, the judge, I'm sorry, has a gatekeeping function that keeps junk science out, to use their terminology, and why, if it's truly, in other words, if we conclude it's junk science, then this was error no matter what findings he made, correct? In other words, it's beyond the purview of opinion testimony. Correct, it's expert, but I would say that it's not science, that it would be more technical or specialized testimony. Okay, fair. So let's say it's still beyond the purview. Why is it within the purview? I mean, do you have any articles? I mean, they point to this, whatever the standard, the American, whoever it is, industry. Do you have anything to the contrary? Well, I mean, are you asking about in terms of general reliability? Yes. Well, I think that the witness specifically talked about being certified by a board. He had to pass a test. He has to go through annual certification. Is that to analyze handwriting, or is that to conclude it's a forgery? Because that's where they draw the distinction, right? They say, you can say this isn't this person's signature. What you can't conclude from it is that it's a forgery. That's where they have heartache. Right, and the conclusion here was that it probably was a forgery, but it wasn't. It definitely is a forgery in this case. And I think, I mean, at minimum, honestly, the experts kind of cancel each other out, because their expert actually reached a stronger conclusion that it was more likely the decedent's signature on the will. So is there sort of a waiver? I realize I'm using the word waiver very loosely here, but you get the drift. A waiver problem for the one defendant who, in fact, introduced an expert on handwriting to then now be complaining about the use of the government's expert on the basis that it's junk science? We had not looked at it in that way, but I think there's a good argument to be made that there is a waiver. If you bring in your own expert and then argue that the expert has... Can I push back on that a little, because it seems to me a little unfair if they did it in the posture they've claimed, which I haven't gone back and checked, which is they fought the expert. The court ruled the expert was admissible, and then they went out and got their own. It seems to me that that can't be a waiver. I know it's being used loosely, but that seems problematic to me, because now they're stuck, because the court's made a ruling. They need to go get their own. Did it happen on that timeline? I can't answer that. I don't know what the timeline was in which they secured their own expert. But wouldn't it matter, the timeline being when they introduced the expert? Because people prepare all sorts of different ways for trial, but if they weren't going to use the expert and didn't use the expert, then I wouldn't be suggesting a waiver possibility. Yes. And in fact, the handwriting analysis came, and this kind of relates to Gary Mallory's deposition, but this was done early on. The initial analyst that looked at this, she ultimately did not testify because of a health issue, but this was done back in 2012. Can I ask you about that deposition? Why not give them a live feed? I mean, that seems like a reasonable request. Well, he was in pretty poor health by the time the trial occurred. But I thought, are they inaccurate? There were no findings made and no medical records submitted at the time they made this request? In other words, the timeline I thought she laid out was like March, and then the trial, and no medical records in between. I believe there was medical records. I thought there were medical records around May or June with respect to the dementia. But certainly his health was not expected to... So the dementia shows his health was deteriorating? Was deteriorating. So at the time that he was deposed, I mean, he had a host of medical issues, diabetes, he had bladder cancer, chronic pulmonary disease. He was hospitalized twice after this deposition, and he had new serious conditions. He had pressure and non-pressure sores, which could be quite serious if you're diabetic. This is not a witness that was going to have a miraculous recovery. Why didn't the district court offer them, if he didn't, the opportunity to depose him again, at least limited to the dementia? I can't answer that. He did give them the opportunity to secure expert testimony concerning his mental state at the time, which can be found at page ID 926, it's record entry number one. And am I right that he also offered that they could introduce the medical records? I believe there was that offer. So they made a motion to exclude his testimony? Were there other motions related to his... A motion to depose him or have a live feed? I'm not sure how the relief was that was asked for. There was never a request for a second deposition. There could have been, but there wasn't. And although the defendants point out that he did go to Arizona in June of 2016, which would be about four and a half, five months before the trial in this case, that sentencing hearing only took 14 minutes. And that's far less time than the two and a half hour deposition and would have been far less time than what would have been required for him to sit through direct and cross-examination. And he was in Arizona and went to the courthouse to be sentenced, is that... Correct. But there are certainly some medical records with his... In October 2015, it was showed that he was in significantly bad health and that generally for his medical appointments, he needed to have house visits instead. Could they have done a deposition at his house then? I don't see a reason why they couldn't have, unless the dementia was such that he could not... He was not in a state to testify. I don't know what the severity of the dementia was at that point. But they certainly had the ability to cross-examine him during that deposition. And they did, in fact, ask him about his memory, they asked him about oxycodone use, and whether he'd had some confusion when he was in the backyard of one of his daughters. They asked him about telling one of his daughters a different account of this will when it was signed. What was their theory, that he was just lying, that he didn't in fact... He was saying he forged the signature, but he in fact didn't do it? Correct, yes. That was their theory. And they were able to attack that during the deposition. And in fact, I think they had a benefit essentially by being able to impeach him without his ability to explain by asking his daughters, well, didn't he tell you a different version? Didn't he say that he signed it in the attorney's office instead? So they were not prejudiced in any way. They certainly had the confrontation right with the deposition. And the court properly admitted the testimony, given his health and his case. With respect to the Exhibit 505 that the court admitted for impeachment, the court properly admitted that under Federal Rule of Evidence 901B4. The defendants argued that there was no witness that had personal knowledge, but you didn't have to have personal knowledge. You simply had to show sufficient distinct characteristics of that document that a jury could find in favor, that it was more likely than not what the government claimed it to be. And what our theory was is that this was a fabricated document by Susan Peock to show that she was doing legal work contemporaneous to this will. As Peock acknowledges, this came from her own proposed trial exhibits. And it contained an endorsement that said it was prepared by Susan Peock, ESQ. She never denied that she or someone in her office prepared it. In fact, when the prosecutor asked, did you prepare an affidavit for Martin Fulis, she said, that's a draft power of attorney, referring to the document, which is at page ID 4876. She then said that her legal assistant could have prepared it. And when she was asked, well, how did this airline road document or address get into this document, she said that Martin Fulis would have told me about that. In fact, that's the only way it could have gotten in there. And so she acknowledges that there's some distinct information that is in this document. For those reasons... So this document first appears on her exhibit list, is that right? It was disclosed to the government, yes. So the government didn't know about it until... So she puts it on her exhibit list and then later says, I'm withdrawing it or I'm taking it back, it's not authentic? I don't know anything about it. But when she puts it on her list, does she actually provide the document to the government? She physically gives this document, 505. And Agent Cost actually testifies that I just recently saw this document. I didn't know anything about this document before. It was never found during the search, and it should have been if it had existed, because it had a date that predated the search. So it should have been uncovered with all the other evidence that we seized from her residence, but it wasn't. So that also was, I think, key. Was it a hard copy that was produced, or was it electronic? I believe it was a hard copy. So what's her theory as to why she produces this document? I don't know why she produced it. I think this was fabricated to try to show that she was doing legal work for Mr. Fulis. She wanted to show the money she got was tied to the work she did for him. But that whole theory would then be supporting the idea that it was properly authenticated. That it came from her, from her records. And the court found that it couldn't have come from anywhere else. And we believe that that was a proper finding, that the distinct characteristics of this document sufficiently authenticated it. But even if the court found that it wasn't, honestly, I mean, Susan Peock's testimony was so incredible. Even the court found, at sentencing, that her testimony about the shenanigans with her tax filings were similar to that. Simply beyond incredible and implausible. That was the most damaging testimony to her, not necessarily this document. Unless this court has further questions, the government at this point will ask the court to affirm the defendant's convictions and the defendant's, well, Mallory and Peock's sentences on the aggravated identity theft convictions and affirm Ms. McKnight's sentence as a whole. Thank you. Just a quick point of clarification. That handwriting expert from the defense was our witness, Kurt Mallory's, not Margaret McKnight's. She did on objecting, but that was not her witness. As far as the new trial goes, the court clearly mixed up the standard of review. You didn't object to the expert, right? No, no. Correct, correct, yeah. I did not raise that issue on appeal. So the court blended the standard of reviews for the new trial and the Rule 29, and I think this comes not from my brief, but from the government's brief in opposition. And so if the court looks at the government's brief in opposition, which is at docket 342, the government in their brief conflates the two standards. If we ultimately conclude in reviewing his order that what he ultimately did is proper under the Rule 33 standard, there would be no reason to remand, correct? If the court could make that conclusion, but I don't think the court can, because I don't think that you can read his order and say that he independently looked at the evidence. I think he looked at it in light and was favorable to the jury. But are we precluded from doing that? Yes. Is there a case? Is it in your brief? I can find it. So the remedy, let me understand the remedy. We just send it back and say, do this the right way. Correct. Yes. So, I mean, the court could ask for more briefing if they wanted to, or the court could just redo the standard of review and then review the testimony and weigh the evidence as it should independently. And which defendants are contesting this? Just remind me. I think I am good. I can't remember. I know I did. Your client, Mallory, is. I don't know. Thank you. Sorry about that. Now, to the point of I'm getting ready to run out of time, but I want to make one quick point about the unavailability. I don't want the court to get confused about what the standard is here. It's the burden on the government to show that he's unavailable at the time of trial. There's no evidence in the record to support that he couldn't travel. His dementia clearly wasn't so bad that he couldn't appear for sentencing on August 30th of 2016. The court proceeded with sentencing, thought he was of sound mind at that point. So a couple months later, we proceed to trial. The court has no updated records whatsoever. The court determines that because he is homebound, that he is res ipsa loquitur, not available. And that's just not supported by the record. Could they have set up a video feed at his house? Is there any evidence about that? Did you present anything or show the court that they could do that? I'm sure they could. We did not ask, because he had clearly traveled to the courthouse, and his health was the same, essentially, as it was at the time of the death. But the government's point about that is that's a 14-minute hearing versus three hours, and those could be significantly different. One, you just sit there in a sentencing unless he allocuted. Another, you're actively involved throughout. And I would say that the government has forfeited that argument below. They did not make the argument that he couldn't travel and withstand the rigors of testimony. What they said was he cannot travel, he's homebound, he cannot leave, that it is the classification of the medical providers that classified him as homebound is proof in and of itself that he cannot leave the house, which clearly isn't true, because he did on August 30th. So whether he could left for a half an hour or four hours, that wasn't the government's argument below. We weren't fighting over that. We were fighting over whether he could leave at all. So with that, I would just ask the court to vacate the conviction room. Thank you. Thank you. Thank you. There is a difference between admissibility under Rule 702 and the gatekeeping function of Dalbert and Kumho Tire. What happened in this case was that the district court failed to conduct the gatekeeping mechanism required to determine whether or not Larry Olson could in fact give any testimony regarding the conclusion of forgery. There was something procedurally wrong with what he did. I mean, he had a hearing, he heard the witness, he asked all the questions you would normally ask in a Dalbert hearing. I mean, doesn't that satisfy that? Procedurally, it was correct. What we know is factually it's wrong. Handwriting analysis as to the determination that something is a forgery is not valid scientific review. What you're saying is, just so I'm clear, no matter what he did, he was wrong. He could have had the best hearing, the best findings. It was wrong. Correct. And I would point the court to the catastrophe of the FBI's lead bullet analysis. Every single agent who came in and testified was an expert in analyzing bullets. They knew how to do chemical testing. They used proper methods. We get that. You have that in your brief. So there's nothing... I just want to be clear. If we disagree on that, you lose. And if we agree, then we perform a harmless error analysis. I would posit that there is no harmless error under this. But yes, if this court believes that handwriting analysis as to the conclusion that something is a forgery is valid scientific evidence under Dalbert and should be admissible, then it's admissible. Irrespective of what the district court did. Yes. I have problems with the district court simply saying in one sentence, I find it reliable, but that's not our... You're not saying that all of his testimony should have been excluded then, right? No. What does it come down to? One page in the transcript? I'm curious. Is it one question? Is it one opinion? It's the section of his testimony where he bolsters and supports his conclusion that this will is in fact a forgery. Did he say probably? He says probably. What was not done, however, was to explain the scientific methodology of what probably means. Probably is the second weakest decision that it might be a forgery. Again, those were things that weren't done in front of the jury, which are separate issues. The issue is he shouldn't have been testifying as to those things in the first place. And we know that the FBI, we know that these experts in this type of science cause great damage in the criminal justice system. Cam Willingham was executed by the state of Texas based on junk arson. Mr. Earhart was executed on the basis of bullet analysis. They make these mistakes. Daubert is designed to protect defendants, to protect the criminal justice system, and what happened in this case failed. For that reason, we request you remand for a new trial. Thank you. Well, the real problem is that handwriting analysis is not a real world discipline. It has no purpose. It's not used for anything except court. So it's kind of an artificial endeavor. Now, it doesn't have to be science to be the subject of expert testimony, but it still is subject to Daubert. That's what Kumo Tire said, which was decided after Jones. And Jones held that since it was pre-Kumo Tire, that the Daubert standards did not apply. But Jones was less specific in articulating which standards did apply. Now, with respect to 505, I kind of like Judge Aper's comment that disbelieving a witness is different from affirmative evidence. Susan P. Yock was devastated with the cross-examination as to the tax counts. That is what it is. But with respect to this forged will scheme, fully two-thirds, if not more, maybe 75% of the government's cross of her was on exhibit 505. They mentioned a fee agreement briefly. They compared that with the low estimated value of the estate at the outset, which I am told is not uncommon. But this exhibit 505... I mean, if she produced this document, doesn't that take care of the argument? Her lawyer filed a witness list with an exhibit list with documents, and this was in there. No idea where this came from. It wasn't used for anything before trial. It wasn't used for anything by the defendant at trial. It wasn't used for anything. Except it was used by the government with pervasive devastating effect during the cross of P. Yock and the closing argument. Judge Carr said, well, there's no reason not to believe she's the source. Well, that's not the standard for authentication. You need some affirmative demonstration of authenticity where it came from. And she didn't acknowledge that her office prepared it. She speculated that her secretary may have prepared it, but she didn't know. And you have to authenticate through someone with firsthand knowledge. This was bootstrapped. Thank you very much.